J. S33002/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF S.B.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: A.W., BIRTH MOTHER, | : | |
| | : | |
| Appellant | : | No. 168 EDA 2015 |

Appeal from the Order Entered December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0057

| | | |
|---|---|---|
| IN RE: ADOPTION OF B.J.L.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: A.W., BIRTH MOTHER, | : | |
| | : | |
| Appellant | : | No. 170 EDA 2015 |

Appeal from the Order Entered December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0058

| | | |
|---|---|---|
| IN RE: ADOPTION OF K.F.L.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: A.W., BIRTH MOTHER, | : | |
| | : | |
| Appellant | : | No. 174 EDA 2015 |

Appeal from the Order Entered December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0059

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.L.K., JR. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: A.W., BIRTH MOTHER, | : | |
| | : | |
| Appellant | : | No. 178 EDA 2015 |

Appeal from the Order Entered December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0060

BEFORE:  FORD ELLIOTT, P.J.E., DONOHUE AND LAZARUS, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:            **FILED JULY 10, 2015**

A.W. ("Mother") appeals from the orders that granted the petitions to involuntarily terminate her parental rights to her four children, K.F.L.K. born in 2001, T.L.K., Jr. born in 2003, B.J.L.K. born in 2005, and S.B.K. born in 2006 ("the Children"), filed by the Montgomery County Office of Children and Youth ("OCY"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b) of the Adoption Act.  We affirm.

T.K., Sr. ("Father"), and Mother met in 2000 and over the course of six years had four children.  Father and Mother never married, and their relationship included several periods in which they lived together and several periods in which they were separated.  From 2007 until 2011, Mother had primary custody of the Children except for K.F.L.K., who resided with Father. During March or April of 2011, Father took custody of all the Children.  They remained with Father and his girlfriend until OCY's involvement in March 2012.  At that time, OCY began investigating an allegation that Father sexually abused K.F.L.K.

OCY devised a safety plan which prevented Father from having contact with K.F.L.K. and her sister, B.J.L.K.  The girls were living with Father's

girlfriend, who subsequently allowed contact with Father. Upon learning of Father's contact with the girls, OCY placed them in foster care on April 16, 2012. The remaining children, both boys, were subsequently removed and placed into foster care on May 4, 2012.

OCY eventually located Mother and established a family service plan ("FSP") for her. The FSP goals for Mother included: maintaining appropriate and stable housing, providing proof of employment or financial stability, completing a parenting class, obtaining a drug and alcohol evaluation and a mental health evaluation, consistently visiting with the Children, and maintaining a parental bond with the Children.

On April 8, 2014, OCY filed petitions to terminate Mother's and Father's parental rights to the Children. Hearings occurred on October 1, 2014 and November 12, 2014. OCY caseworker, Julia Solomon, ("Solomon") testified that she was assigned the case from June 2012 until June 2014. (Notes of testimony, 10/1/14 at 41, 60.) She stated that Mother made inconsistent progress towards housing. (*Id.* at 54.) Solomon listed Mother's different living situations: Mother resided with her boyfriend's parents until late 2012; Mother and her boyfriend lived with friends for a time; they next obtained housing for a short term; none of these places was big enough to house the Children. (*Id.* at 54-55.) It was not until August of 2013 that Mother presented appropriate housing for the Children. (*Id.* at 55-56.) Solomon never saw this housing because it was in Franklin County;

however, the Office of Franklin County Children and Youth conducted a courtesy visit and took pictures as well as verified that the home was appropriate for the Children. (*Id.* at 56.) Mother only stayed in that home for four months until November 2013. (*Id.*) Mother told Solomon the landlord was selling the home and informed her that she had to leave. (*Id.*) In December 2013, Mother and her boyfriend were residing with friends. (*Id.* at 57.)

Solomon described Mother's financial situation while she was assigned to the case as "relatively unstable." (*Id.*) According to Solomon, Mother indicated that she applied for disability but she had not received it. (*Id.*) Solomon believed the issue of disability was never resolved. (*Id.*) Solomon stated Mother had obtained various different jobs in the places she lived, *e.g.*, at a gas station, a restaurant, and a garage. Mother provided Solomon with one or two paystubs, but noted the employment situation was very unstable. (*Id.* at 58.)

When asked to discuss Mother's transportation, Solomon referred to it as "somewhat unstable." (*Id.*) According to Solomon, Mother had different cars, but Mother cited a lack of reliable transportation as reasons for missing visits, as well as a lack of money for gasoline. (*Id.*) In August 2013 when Mother was finally residing in appropriate housing in Franklin County, Solomon attempted to arrange for Mother to have Saturday visits with the Children in Pottstown. (*Id.*) However, Mother was required to provide her

driver's license and a copy of her insurance information. (***Id.*** at 59.) Mother never provided the insurance information, so the Saturday visits did not take place. (***Id.***)

Mother did obtain a drug and alcohol evaluation and a psychiatric and psychological evaluation. Mother also completed a parenting class. (***Id.*** at 59-60.) As far as visitation with the Children, Solomon testified Mother attended 34 out of 50 scheduled visits. (***Id.*** at 62.) The reasons for missing visits were generally a lack of transportation or lack of gas money for the car, also Mother sometimes had doctors' appointments or there were a few times where she was admitted to the hospital for various reasons. (***Id.*** at 63.)

On December 10, 2014, the trial court granted the petitions based on Section 2511(a)(2) and (b). These appeals followed.[1]

Mother raises the following issues for our consideration:

> 1. Whether there was sufficient evidence to support the findings of this Honorable Court that the agency proved by clear and convincing evidence the requirements of 23 Pa.C.S. 2511(a)(1) and (2) for the involuntary termination of Birth Mother's parental rights?
>
> 2. Whether this Honorable Court abused its discretion in terminating the parental rights of Birth Mother on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care,

---

[1] Father has filed separate appeals at Nos. 166, 173, 179, and 182 EDA 2015.

when those factors were beyond Birth Mother's control pursuant to 23 Pa.C.S. 2511(b)?

3. Whether this Honorable Court abused its discretion in finding that the developmental, physical and emotional needs and welfare of the children will be best served by the termination of Birth Mother's parental rights pursuant to 23 Pa.C.S. 2511(b), when there is a strong and loving bond between Birth Mother and the children, and severance of that bond will cause irreparable harm to the children?

4. Whether this Honorable Court erred in granting the agency's Petition to change the goal from reunification to adoption when the goal of reunification remains the most appropriate and feasible goal based on the statutory factors set forth in 42 Pa.C.S. 6351(f)?

5. Whether this Honorable Court erred in granting the agency's Petition to change the goal from reunification to adoption when the agency failed to make reasonable efforts to finalize the permanency plan goal of reunification?

6. Whether this Honorable Court had sufficient evidence to determine the appropriateness of changing the goal from reunification to adoption when the court did not consult with the children regarding the permanency plan pursuant to 42 Pa.C.S. 6351(e)(1)?

Mother's brief at 4-5.

In reviewing an appeal from the termination of parental rights, we are mindful of our standard of review:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to

- 6 -

accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa.Super. 2009). This court may affirm the trial court's decision regarding the termination of

parental rights with regard to any one subsection of Section 2511(a). ***See***

***In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (***en banc***). Further, the

court must also consider the provisions of Section 2511(b).

We note Mother presents an argument concerning Section 2511(a)(1). While OCY's petitions to terminate Mother's parental rights were filed pursuant to Sections 2511(a)(1) and (2), the trial court clearly terminated Mother's parental rights under only one section, 2511(a)(2). Therefore, our analysis of this case centers on Section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of

- 8 -

> the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S.A. § 2511.

Regarding the termination of parental rights under Section 2511(a)(2), our supreme court has observed as follows:

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the [] Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d at 827 (citation omitted).

Mother argues she took steps to improve her situation in order to have the Children returned to her. Mother contends that the difficulties she had in maintaining housing and employment were out of her control. She also maintains that she was close to having the Children returned to her and, therefore, should have been given more time. (Mother's brief at 13.)

The trial court provided the following analysis:

> Throughout the history of the placement of the children, mother's ability to meet these [FSP] goals was "inconsistent." Birth mother lived in multiple different living arrangements, including living with her then boyfriend's parents in a residence that did not have enough room for the children to reside there as well. In August of 2013, birth mother advised OCY caseworker Julia Solomon that she had

obtained an appropriate home in Franklin County. The Office of Children and Youth of Franklin County visited the home and verified that it was appropriated [sic] for the children to reside there. However, in November 2013, the birth mother left that home at the request of the landlord. Thereafter, birth mother's residential situation again became unstable. OCY Caseworker Stephanie Setty, who was assigned this case beginning in January 2014, testified that birth mother moved into a new home in April 2014, with her then boyfriend, but that this home was not adequate to provide room for all four children. In September 2014, birth mother and her boyfriend split up, and birth mother moved to a motel, where she was living at the time of the hearing. N.T. October 1, 2014, pp. 167-68.

Although birth mother provided Ms. Solomon with pay stubs from various jobs from time to time, her employment also remained unstable. OCY caseworker Stephanie Setty testified that although birth mother claimed to be working full time at a Comfort Suites, the pay stub provided to OCY, which birth mother asserts was her first pay stub for this job, reflected work of approximately 15 hours. N.T. October 1, 2014, p. 168. Birth mother has been unable to provide pay stubs demonstrating consistent employment or financial security, a stable residence and proof of payment of rent and utilities.

Her ability to obtain transportation to permit her to attend visits with the children was inconsistent, and she frequently stated that she needed to borrow a car or lacked money to pay for gas to attend visits. Birth mother's attendance at visits with the children was inconsistent. During the period Ms. Solomon was the caseworker, birth mother was offered 50 visits and attended 34. N.T. October 1, 2014, p. 62. Exhibit OCY-12. During the period April 2014 through September 2014, birth mother was offered 14 scheduled visits, and attended only 8. The visits that birth mother missed included times when she was in the hospital, as well as visits she requested be rescheduled. In addition,

> at least one of the scheduled visits was cancelled due to a request of the foster family. However, Ms. Solomon testified that the children did not see their mother for over a month at the end of 2013, and that "often they would receive some gifts from mother, but it would be very late with regards to their birth and the holiday. And often she would promise gifts and they would not receive them."
> N.T. October 1, 2014, p. 73.

Trial court opinion, 12/10/14 at 13-14.

Based on the above, Mother's FSP goals of maintaining appropriate and stable housing, providing proof of employment or financial stability, and consistently visiting the Children were not met. We note that in accordance with her FSP goals, Mother did obtain psychiatric, psychological, and drug and alcohol counseling as well as complete a parenting class. However, the testimony from the therapists who worked on this case revealed Mother had not demonstrated an ability to meet the Children's needs for safety or security.

Pinky Mehta, a licensed marriage and family therapist, who worked for Creative Health Services in their Family Based Program,[2] testified she worked with the Children from July of 2013 to February 25, 2014. (Notes of testimony, 10/1/14 at 9, 18.) Ms. Mehta also noted that she met with Mother either separately or with the Children usually once a week. (*Id.* at

---

[2] Ms. Mehta described the Family Based Program as an eight-month authorization program that offers the highest level of care in an outpatient setting in Pennsylvania. (*Id.* at 9.) The program works with children who are at risk of out-of-home placement or currently in out-of-home placement due to aggressive defiant behaviors. (*Id.*)

14.) According to Ms. Mehta, the Children feared that if they were returned to Mother, she would not be able to protect them from Father. (*Id.* at 18.)

OCY Caseworker Solomon testified that she had discussions with Mother regarding how she would protect the Children and handle visits with Father if she regained custody. (*Id.* at 66.) Ms. Solomon stated she was concerned with Mother's answer. According to Ms. Solomon, "the answer that I received from mother repeatedly was that, you know, she wouldn't let them be unsupervised with father right away, and she would let -- see what they were comfortable with. But she always indicated right away." (*Id.* at 67.) When Ms. Solomon asked, "does that mean you would allow them to be unsupervised with [Father] at some point," Mother indicated that was the case, if that is what the Children wanted. (*Id.*)

Diana S. Rosenstein, Ph.D., performed assessments of Mother's parenting capacity and evaluations of the attachment of each of the Children to both Mother and Father. She testified, "the Children have learned that they can't count on [Mother]." (Notes of testimony, 11/12/13 at 36.)

OCY Caseworker Solomon testified that although Mother completed some of the concrete goals of her FSP, OCY continued to have concerns about her parenting ability, her relationship with each child, and her ability to understand and address the Children's fears, concerns, and emotional needs. (Notes of testimony, 10/1/14 at 73-74.)

This court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340. The evidence here demonstrates that after approximately two years, Mother continues to be unable to safely house and care for the Children. Their lives cannot be put on hold indefinitely. *See In re Z.P.*, 994 A.2d 1108, 1125 (Pa.Super. 2010) (a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting."). After our review of the record in this matter, we find the trial court's determinations regarding Section 2511(a)(2) are supported by sufficient, competent evidence in the record.

Having determined that the requirements of Section 2511(a) were satisfied, we proceed to review whether the requirements of Subsection (b) were satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*). This court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b).

In reviewing the evidence in support of termination under Section 2511(b), our supreme court stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super.2012). In *In re E.M.*, 620 A.2d at 485, this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Instantly, Mother argues that she has a bond with the Children. She maintains the Children love her and she has continued in her role as a parent throughout the pendency of the Children's placement. Additionally, Mother points out that the guardian *ad litem*'s expert, Dr. Rosenstein, thought it would be in the Children's best interest if they continued contact with her because the bond was so strong. (Mother's brief at 15.)

Initially, we observe that the trial court concluded: "I find that although there is a strong emotional bond between each of the children and their birth mother, the attachment is not secure." (Trial court opinion, 12/10/14 at 18.) Clearly, it is undisputed that Mother has a bond with the Children. However, the existence of a parental bond with the Children does not preclude termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super. 2008).

As to Mother's claim that Dr. Rosenstein thought continued contact with Mother would be in the Children's best interest because of the strong bond, that claim is not entirely accurate. Dr. Rosenstein testified as follows:

> [Attorney for Mother:] When you recommend[ed] mother's rights to be terminated, is your recommendation also that they have no further contact with her in the future? That doesn't appear to be addressed [in your report].
>
> Dr. Rosenstein: No, it wasn't addressed. Let me think about it for a moment. I believe that it would be in their interest to have contact with mother if she were more reliable, that the fact that mother often cancels scheduled visits upsets the children greatly, makes them feel that she's untrustworthy. And that's not in their interests.
>
> If she could be reliable and visit with them reliably, then I would be in favor of contact.

Notes of testimony, 11/12/14 at 75.

The Children remain in foster care because Mother is not reliable and has been unable to meet her FSP goals concerning stable housing, steady employment or financial stability, and consistent visitation. Mother has had two years to meet the above goals, yet she needs more time. (**See** Mother's brief at 13.)

According to Dr. Rosenstein, the girls expressed a desire to be adopted, and it seems "that they would rather have the stability and the loving care that they feel they're getting in their foster home than always being concerned about whether mom is going to be able to continue to take

care of them." (Notes of testimony, 11/12/14 at 38.) Additionally, Caseworker Solomon stated she was concerned about:

> [Mother's] ability to meet the emotional needs of the children. Multiple times when [the] children had expressed concerns or expressed being upset or visibly being upset, I observed the mother didn't appear to really know how to deal with it and how to comfort [the] children and provide reassuring feedback.

Notes of testimony, 10/1/14 at 65.

Based on this record where stability, reliability, and ability to meet the Children's emotional or developmental needs is still lacking on Mother's part, we discern no basis for disturbing the trial court's conclusion that termination of Mother's parental rights served the needs and welfare of the Children. *See In re Adoption of Michael J.C.*, 486 A.2d 372, 375 (Pa. 1984) (when a parent has demonstrated a continued inability to conduct his or her life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified).

Mother's remaining three issues concern the goal change from reunification to adoption. In her brief, Mother fails to present three arguments addressing each issue. *See* Pa.R.A.P. 2119(a) (providing that the argument "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part -- in distinctive type or in

type distinctively displayed -- the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). Instead, Mother repeats her earlier claim that the Children have a significant bond with Mother and the filing of the petition for termination of Mother's parental rights does not meet the needs and welfare of the Children. (Mother's brief at 17.)  We have already determined that the termination of Mother's parental rights does indeed meet the needs and welfare of the Children.

Accordingly, the orders terminating Mother's parental rights are affirmed.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2015